# In the United States District Court
# for the Southern District of Georgia
# Waycross Division

| | | |
|---|---|---|
| MONTRÉ MERRITT, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | CV 514-083 |
| | * | |
| COREY GAY and CITY OF | * | |
| WAYCROSS, GEORGIA, | * | |
| | * | |
| Defendants. | * | |

## ORDER

This matter is before the Court on a Motion for Summary Judgment filed by Defendant Corey Gay ("Gay"), dkt. no. 37, and a Motion for Summary Judgment separately filed by Defendant City of Waycross, Georgia (the "City"), dkt. no. 39. For the reasons that follow, Defendants' Motions (dkt. nos. 37, 39) are **GRANTED**.

### FACTUAL BACKGROUND

On January 17, 2014, Plaintiff Montré Merritt ("Plaintiff"), a high-school student at the time, spent the evening at a school basketball game. Dkt. No. 37-1 (Gay's Statement of Material Facts Not in Dispute, hereinafter "SMF"), ¶ 1.[1] He left the school shortly before midnight to return home.

---

[1] Plaintiff has filed a Response largely agreeing with, or otherwise failing to object to, Gay's recitation of the facts of this case.

Id. at ¶ 3.  As Plaintiff was driving down Albany Avenue, he passed by Gay, an on-duty police officer with the City of Waycross Police Department.  Id. at ¶¶ 6, 65.  Gay saw Plaintiff's vehicle and believed that it was traveling far to the right side of the road, creating a potential hazard and indicating possible impairment.  Id. at ¶ 7.[2]  Gay turned his police car to follow Plaintiff's vehicle, attempting to catch up with it to confirm the suspected lane violation.  Id. at ¶ 8. Plaintiff saw Gay's police car approaching behind him at a fast speed, and, although its lights and siren were not activated, he could tell that it was a police car from the light bar on its roof.  Id. at ¶ 9-10.

Plaintiff soon reached the intersection of Albany Avenue and J Street, where he turned right.  Id. at ¶ 8.  As Gay had not yet caught up with Plaintiff's vehicle by the time that Plaintiff turned onto J Street, Gay was unable to verify the perceived lane violation.  Id.  However, as Plaintiff made the turn, Gay could see that he was leaning in forward in such a way

---

Dkt. No. 48-1 (Plaintiff's Response to Statement of Material Facts, hereinafter "Pl.'s Resp. to SMF").  Accordingly, the Court, for ease of exposition, cites only to Gay's version of the facts (dkt. no. 37-1) as the SMF and specifically notes herein any facts with which Plaintiff disagrees in whole or in part.

[2]  According to Plaintiff, he was not driving far to the side of the road at any time.  Id. at ¶ 7.

AO 72A
(Rev. 8/82)

that he did not appear to be wearing a seatbelt. Id. at ¶ 12.[3]
Gay also believed that one of the taillights or brake lights on
Plaintiff's vehicle was not working. Id. at ¶ 13.[4] By the time
that Gay reached the intersection and turned right onto J
Street, Plaintiff's vehicle was approximately 150 yards ahead of
him. See id. at ¶ 14; Pl.'s Resp. to SMF, ¶ 14.

At that time, Plaintiff was approaching the intersection of
J Street and Oak Street, where his house sat on a corner. See
SMF, ¶ 33; Pl.'s Resp. to SMF, ¶ 15. Plaintiff turned left onto
Oak Street and began to maneuver his vehicle into his parking
spot at his house. See SMF, ¶ 17; Pl.'s Resp. to SMF, ¶ 15. As
was his usual practice, Plaintiff crossed from the right lane
into the oncoming lane of traffic—pulling his vehicle halfway
into the oncoming lane such that it was straddling the center
line—so that he could back into his parking spot. SMF, ¶¶ 19-
20, 38. While Plaintiff was making this maneuver, Gay ran the
stop sign at the intersection of J Street and Oak Street and,
upon turning onto Oak Street, began to pull his car up to

---

[3] Plaintiff disputes this fact only to the extent that he points out
that Gay had not fully caught up to his vehicle by the time that he
turned onto J Street. Id. at ¶ 12. Plaintiff also maintains that he
was, in fact, wearing a seatbelt at all relevant times, and suggests
that Gay has fabricated this story to cover up ulterior motives for
following him. Id. at ¶¶ 40-41.

[4] Plaintiff shows that the taillights and brake lights on his vehicle
were working both before he left home and after he returned home that
evening, and asserts that Gay must have fabricated this story as well.
Id. at ¶ 42.

AO 72A
(Rev. 8/82)

Plaintiff's vehicle and flicked on its lights. <u>See</u> <u>id.</u> at ¶¶ 16, 18; Pl.'s Resp. to SMF, ¶ 15.

Plaintiff stopped his vehicle in the middle of the street and, preparing to back into his parking spot, put the vehicle in reverse, dkt. no. 37-3 (Plaintiff's Deposition, hereinafter "Pl.'s Dep."), 49:19-20, 51:1-3, and turned the steering wheel sharply to the left and then to the right, SMF, ¶ 21. Meanwhile, Gay pulled his police car within "three to five steps" of Plaintiff's vehicle. Pl.'s Dep., 50:3-6. Gay then exited his police car, thinking that Plaintiff was going to jump out of his vehicle and attempt to run away on foot. SMF, ¶ 22.

Just as Plaintiff was about to begin backing up, he noticed the flashing lights of the police car behind him. <u>Id.</u> at ¶ 23. Plaintiff put his vehicle in park, but, due to a slight incline in the road, the vehicle rolled backward before stopping. <u>See</u> <u>id.</u> at ¶ 24; Pl.'s Resp. to SMF, ¶ 24.[5] Gay saw that Plaintiff's vehicle was moving backward toward him, and immediately activated his air horn and called for backup. SMF, ¶ 25.

---

[5] In his Response to the SMF, Plaintiff maintains that Gay's police car was still moving and that Gay had not yet exited his car at this time. <u>Id.</u> at ¶ 26 (citing Pl.'s Dep., p. 49). However, the portion of Plaintiff's Deposition relied upon for this response makes clear that Gay's car was still moving when Plaintiff initially stopped his vehicle and shifted into reverse, and that Plaintiff is uncertain as to where, exactly, Gay was—whether in or out of his car—when Plaintiff later put his vehicle in park and it rolled backward before stopping once more. Pl's Dep., 49:19-52:16.

AO 72A
(Rev. 8/82)

At that moment, Plaintiff's vehicle was angled so that the driver's side door was facing toward Gay, id. at ¶ 26, and the driver's side window was rolled down, dkt. no. 37-4 (Gay Deposition, hereinafter "Gay Dep."), 36:12-13. Because drivers often pull to the right side of the road for a traffic stop, Gay was uncertain of what Plaintiff was doing—"whether he was trying to turn around or whether he was trying to angle the car in such a way that he could shoot at . . . Gay out of the window." SMF, ¶ 27. Additionally, Gay knew that the surrounding neighborhood had a history of drug activity, which made him even more worried about Plaintiff's "abnormal behavior." Id. at ¶ 28.

Drawing his gun and pointing it toward Plaintiff, Gay approached the vehicle. Id. at ¶ 29. Gay shouted at Plaintiff to get out of the vehicle, and Plaintiff promptly complied with his command. See id. at ¶¶ 29, 31. Gay then ordered Plaintiff to lie on the ground and, still holding him at gunpoint, handcuffed him and asked him for his driver's license. See id. at ¶¶ 31-32; Pl.'s Resp. to SMF, ¶ 32. Plaintiff informed Gay that he lived at the house on the corner of J Street and Oak Street, and indicated that his driver's license was in his back pocket. SMF, ¶ 33. Upon hearing this, Gay helped Plaintiff stand up and leaned him against the police car. Id.[6]

---

[6] Gay had kept Plaintiff on the ground for "maybe about 25 seconds." SMF, ¶ 34.

AO 72A
(Rev. 8/82)

With Plaintiff leaning against the police car, Gay was able to check his driver's license, which Gay noted was only a provisional license. Id. at ¶ 35. Gay confirmed that Plaintiff's license listed his address as that of the house on the corner, and, as such, Gay began to remove the handcuffs. Id. As Gay was removing the handcuffs, Plaintiff's mother exited the house and stated that Plaintiff lived there. Id. at ¶ 36. Around this time, three or four other police officers arrived at the scene, and Plaintiff's father returned home from work. Id. at ¶ 37. Gay explained to Plaintiff that he had seen Plaintiff's vehicle swerving back and forth in the lane, and that he had stopped Plaintiff for a seatbelt violation. Id. at ¶ 40. Gay then issued Plaintiff a citation for the perceived seatbelt violation. Id.

Because Gay also thought that one of the vehicle's taillights or brake lights was not working, he, along with another officer and Plaintiff's father, tested the lights but found that they were functioning properly. Id. at ¶¶ 42-43. Although Gay suggested that one light might have had a short based on his earlier observation, Gay did not issue a citation for improper brake lights. Id. at ¶¶ 44-45. Nor was Plaintiff cited for driving alone on a provisional license, though it is undisputed that he could have been. Id. at ¶ 46. The parties further agree that Gay did not search Plaintiff's vehicle at any

AO 72A
(Rev. 8/82)

time, and that he shouted but did not curse, verbally threaten, or act in a rude manner toward Plaintiff or his parents during the incident. Id. at ¶¶ 30, 39.

Two days later, on January 19, 2014, Plaintiff filed a formal complaint against Gay with the City of Waycross Police Department. Id. at ¶ 48. The police department investigated Plaintiff's complaint and ultimately determined that Gay's actions during the traffic stop were inconsistent with departmental policy regarding the use of force. Id. at ¶ 49. The police department suspended Gay for a period of five days. Id. at ¶ 50.

Although Plaintiff was not physically injured during his encounter with Gay, he has allegedly suffered from nightmares, lack of sleep, and trust issues since the incident. Id. at ¶ 51. Plaintiff also asserts that he has spoken with religious advisers about his psychological injuries. Id. at ¶ 52. Nevertheless, it is undisputed that he has not sought formal counseling, missed any school, or had to take any medication as a result of the incident. Id. at ¶¶ 52-53.

Plaintiff maintains that Gay's decision to stop him was racially motivated, but neither Plaintiff nor his parents identifies any evidence or facts to support this belief. See id. at ¶¶ 56, 61. Plaintiff and his mother also claim that Gay has a reputation in the community for being "quick to pull his

AO 72A
(Rev. 8/82)

gun" and not liking African Americans, but neither knows of any specific instances in which Gay has treated an African American unfairly or otherwise acted in a racist fashion. See id. at ¶¶ 55, 58. They cite instances in which others have had "run-ins" with Gay, though they do not suggest that Gay acted unprofessionally on these occasions, other than one time where, according to Plaintiff's mother, Gay was rude to two individuals during a traffic stop. Id. at ¶¶ 57, 59-60. Plaintiff also suspects that Gay might have stopped him because his vehicle is a type frequently used by drug dealers, but the parties agree that Gay never said anything to Plaintiff that would indicate that the type of vehicle that he was driving played any role in the decision to stop him. Id. at ¶¶ 63-64. Furthermore, it is undisputed that Gay did not know Plaintiff or his vehicle before the incident in question, and that Plaintiff and his family had never had any negative experiences with Gay before this encounter. Id. at ¶¶ 66-67.

**PROCEDURAL BACKGROUND**

Plaintiff filed suit against Gay, in both his individual and official capacities, and the City on October 16, 2014. Dkt. No. 1. In counts one and two of his Amended Complaint, Plaintiff seeks to hold Defendants liable under Georgia law for false arrest and intentional infliction of emotional distress, respectively. Dkt. No. 4, ¶¶ 23-28. Plaintiff's count three

alleges a state-law claim of negligent supervision against the City, id. at ¶¶ 29-32, while count four claims that Gay committed assault and battery in violation of state law, id. at ¶¶ 33-36. Finally, in count five, Plaintiff sets forth a cause of action against Gay pursuant to 42 U.S.C. § 1983 ("Section 1983") for alleged deprivations of his rights under the Fourth Amendment to the United States Constitution. Id. at ¶¶ 37-40. Plaintiff seeks compensatory damages, interest, costs, and attorney's fees from both Defendants and punitive damages from Gay. Id. at ¶¶ 25, 28, 32, 36, 40.

On October 13, 2015, Gay filed the instant Motion seeking summary judgment in his favor on Plaintiff's claims against him. Dkt. No. 37. Gay submitted in support of his Motion transcripts of his own deposition and the depositions of Plaintiff, Plaintiff's parents, and the Chief of the City of Waycross Police Department. See Dkt. Nos. 37-3 to -7. On the next day, October 14, 2015, the City separately moved for a summary ruling on the claims against it, relying on the same deposition transcripts and also attaching copies of Plaintiff's complaint with the police department, the police department's documentation of its investigation into the complaint, applicable police department policies, and a report on bias-based profiling. Dkt. No. 39 & Exs. A-J; Dkt. Nos. 43-45. Plaintiff filed a Response in opposition to Gay's Motion on

9

November 23, 2015, dkt. no. 48, and Gay timely filed a Reply thereto, dkt. no. 50. Plaintiff did not respond to the City's Motion during the requisite time period and has not sought leave of Court to do so at any time. Both Gay's and the City's Motions are now ripe for the Court's review.

## STANDARDS OF REVIEW

Summary judgment is required where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." <u>FindWhat Inv'r Grp. v. FindWhat.com</u>, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)). A dispute over such a fact is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Id.</u> In making this determination, the court is to view all of the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. <u>Johnson v. Booker T. Washington Broad. Serv., Inc.</u>, 234 F.3d 501, 507 (11th Cir. 2000).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). To

AO 72A
(Rev. 8/82)

satisfy this burden, the movant must show the court that there is an absence of evidence to support the nonmoving party's case. Id. at 325. If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist. Anderson, 477 U.S. at 257.

The nonmovant may satisfy this burden in two ways: First, the nonmovant "may show that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion, which was 'overlooked or ignored' by the moving party, who has thus failed to meet the initial burden of showing an absence of evidence." Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1116 (11th Cir. 1993) (quoting Celotex Corp., 477 U.S. at 332 (Brennan, J., dissenting)). Second, the nonmovant "may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id. at 1117. Where the nonmovant attempts to carry this burden instead with nothing more "than a repetition of his conclusional allegations, summary judgment for the defendants [is] not only proper but required." Morris v. Ross, 663 F.2d 1032, 1033-34 (11th Cir. 1981) (citing Fed. R. Civ. P. 56(e)).

AO 72A
(Rev. 8/82)

## DISCUSSION

### I.  Gay's Motion for Summary Judgment (Dkt. No. 37)

Gay argues, in part, that he is entitled to summary judgment on all of Plaintiff's claims against him in his official capacity, because the suit against him in this capacity is duplicative of the suit against the City.  Dkt. No. 37-2, pp. 7-8.  As to Plaintiff's claims against him individually, Gay contends that qualified immunity shields him from suit under Section 1983.  Id. at pp. 8-22.  He similarly asserts that official immunity protects him from being sued individually for alleged violations of state law.  Id. at pp. 22-24.  Finally, Gay submits that there is no factual basis for an award of punitive damages in this case.  Id. at pp. 24-25.

In his Response, Plaintiff does not address Gay's argument with respect to the official-capacity claims.  See Dkt. No. 48.[7] Plaintiff does, however, urge the Court to deny Gay's Motion as to the individual claims, on the basis that the officer does not enjoy qualified or official immunity under the facts of this case.  Id. at pp. 4-18.  Plaintiff also maintains that the issue of punitive damages should be decided by a jury rather than on summary judgment.  Id. at p. 18.

---

[7]  Gay contends in his Reply brief that Plaintiff's failure to respond to this argument results in an abandonment of these claims.  Dkt. No. 50, p. 8.

AO 72A
(Rev. 8/82)

## A. Section 1983 and State-Law Claims Against Gay in His Official Capacity (Counts One, Two, Four, and Five)

When a plaintiff brings a claim in his complaint but later fails to respond to a motion seeking summary judgment against him on that claim, the plaintiff is deemed to have abandoned the claim. See Clark v. City of Atlanta, 544 F. App'x 848, 855 (11th Cir. 2013) ("The district court, therefore, properly treated as abandoned the [plaintiffs'] excessive force and state law claims, which were alleged in the complaint, but not addressed in opposition to the motion for summary judgment."). In the case at bar, Plaintiff does not respond to Gay's arguments concerning the official-capacity claims or otherwise discuss these claims at any point in his briefing on the instant Motion. See Dkt. No. 48. Plaintiff's failure to do so constitutes an abandonment of these claims and thus warrants the entry of judgment in favor of Gay at this stage. Gay's Motion is, therefore, **GRANTED** as it relates to the claims against him in his official capacity.

## B. Section 1983 Claims Against Gay in His Individual Capacity (Count Five)

"Qualified immunity protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Andujar v. Rodriguez, 486

AO 72A
(Rev. 8/82)

F.3d 1199, 1202 (11th Cir. 2007) (quoting Dalrymple v. Reno, 334 F.3d 991, 994 (11th Cir. 2003)). A government official who raises qualified immunity as an affirmative defense "must initially establish that he was acting within his discretionary authority." Skop v. City of Atlanta, 485 F.3d 1130, 1136 (11th Cir. 2007). If it is shown that the official was acting within the scope of his discretionary authority, "the burden shifts to the plaintiff to show that the official is not entitled to qualified immunity." Id. at 1136-37.

For the plaintiff to overcome qualified immunity, he must show that "(1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1264 (11th Cir. 2004) (citing Wilson v. Layne, 526 U.S. 603, 609 (1999)); see also Davis v. Self, 547 F. App'x 927, 933 (11th Cir. 2013) ("Meanwhile, as the Supreme Court recently reiterated, '[q]ualified immunity . . . protects all but the plainly incompetent or those who knowingly violate the law.'" (alterations in original) (quoting Messerschmidt v. Millender, 132 S. Ct. 1235, 1244 (2012))). "If the plaintiff prevails on both prongs of this test, then the defendant is unable to obtain summary judgment on qualified immunity grounds." Holloman ex rel. Holloman, 370 F.3d at 1264.

AO 72A
(Rev. 8/82)

## 1. Discretionary Function

An officer was acting in the scope of his discretionary authority if he was "(a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize." Id. at 1265-66 (citing Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1185 n.17 (11th Cir. 1994)). This test requires analyzing the "general nature of the defendant's action, temporarily putting aside the fact that it may have been committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances." Id. at 1266. For the first prong, "the defendant must have been performing a function that, but for the alleged constitutional infirmity, would have fallen with[in] his legitimate job description." Id. (emphasis omitted).

For the second prong, the Court must determine whether the officer was "executing the job-related function—that is, pursuing his job-related goals—in an authorized manner." Id.

> Each government employee is given only a certain "arsenal" of powers with which to accomplish [his] goals. For example, it is not within a teacher's official powers to sign her students up for the Army to promote patriotism or civic virtue, or to compel them to bring their property to school to redistribute their wealth to the poor so that they can have firsthand experience with altruism.

15

Id. at 1267. Qualified immunity does not protect one who pursues a job-related goal through means "fall[ing] outside the range of discretion that comes with an employee's job." Id.

In the instant matter, the parties agree that Gay was acting in the scope of his discretionary authority when the alleged constitutional violations occurred. See Dkt. No. 37-2, pp. 9-10; Dkt. No. 48, p. 4 n.1. Enforcing traffic laws and conducting traffic stops are squarely within the realm of an on-duty police officer's legitimate job-related functions. Moreover, Plaintiff does not contend—and nothing in the record indicates—that Gay used unauthorized means to fulfill these job-related goals. Rather, because it is undisputed that Gay was acting within his duties as an officer of the City of Waycross Police Department when the alleged constitutional violations took place, Gay has sustained his burden of showing that he was acting in his discretionary capacity. The burden thus shifts to Plaintiff to demonstrate that qualified immunity nevertheless does not protect the officer's conduct.

## 2. Violation of a Constitutional Right

The Fourth Amendment, applicable to the states through the Fourteenth Amendment, guarantees citizens the right to be free from unreasonable searches and seizures of their person and property. U.S. Const. amend. IV; see also U.S. Const. amend. XIV. A personal encounter between a police officer and a

16

AO 72A
(Rev. 8/82)

citizen constitutes a "seizure" where "the officer, by means of physical force or show of authority, has in some way restrained the liberty of [the] citizen." Courson v. McMillian, 939 F.2d 1479, 1488 (11th Cir. 1991) (quoting Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968)). As such, the Fourth and Fourteenth Amendments are implicated where, as here, a police officer stops a vehicle and detains its occupants, even though the stop is for a limited purpose and results in only a brief detention. Id. at 1489-90 (citing Delaware v. Prouse, 440 U.S. 648, 653 (1979)).

> a.  Allegations That the Stop Was an
>     Unreasonable Seizure at the Outset

A traffic stop is constitutional when an officer has probable cause to believe that the driver of a vehicle has committed a traffic violation. United States v. Spoerke, 568 F.3d 1236, 1248 (11th Cir. 2009) (citing United States v. Harris, 526 F.3d 1334, 1337 (11th Cir. 2008)). A stop also occurs within constitutional bounds when it is based on reasonable suspicion that the driver has engaged or is engaging in criminal activity, see id. (citing Harris, 526 F.3d at 1337); see also Terry v. Ohio, 392 U.S. 1, 27 (1968), or that he is unable to safely operate a vehicle due to some impairment of a noncriminal nature, see Cady v. Dombrowski, 413 U.S. 433, 441-42 (1973); Terry, 392 U.S. at 13-14. Probable cause exists where "the facts and circumstances within the officer's knowledge, of

which he has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed or is committing an offense." Ortega v. Christian, 85 F.3d 1521, 1525 (11th Cir. 1996) (citing Marx v. Gumbinner, 905 F.2d 1503, 1505 (11th Cir. 1990)). This standard "does not require overwhelmingly convincing evidence," but rather only "reasonably trustworthy information." Id. (quoting Marx, 905 F.2d at 1506). Reasonable suspicion, on the other hand, is present where an officer has "a particularized and objective basis" for suspecting the involvement of criminal activity or an impairment, though the likelihood of the same "need not rise to the level required for probable cause[] and . . . falls considerably short of satisfying a preponderance of the evidence standard." See Hargis v. City of Orlando, 586 F. App'x 493, 499 (11th Cir. 2014) (quoting United States v. Arvizu, 534 U.S. 266, 273-74 (2002)). Notably, a court "do[es] not ask whether reasonable suspicion or probable cause actually existed" but instead must "determine only 'whether reasonable officers in the same circumstances and possessing the same knowledge as the [d]efendant[] could have believed that [reasonable suspicion or] probable cause existed.'" Young v. Eslinger, 244 F. App'x 278, 279 (11th Cir. 2007) (third alteration in original) (emphasis added) (internal quotation

18

marks omitted) (quoting Swint v. City of Wadley, 51 F.3d 988, 996 (11th Cir. 1995)).

In the case at bar, the undisputed facts demonstrate, as a matter of law, that Gay had probable cause to stop Plaintiff. Pursuant to Georgia law, a driver and any occupant in the front seat of a passenger vehicle must wear a seatbelt, O.C.G.A. § 40-8-76.1(b), and their failure to do so provides adequate grounds for a police officer to initiate a traffic stop, Clark v. State, 700 S.E.2d 682, 684 (Ga. Ct. App. 2010). Georgia law also requires that a driver stay in his lane of traffic and not cross the center of the roadway unless he is lawfully passing another vehicle, attempting to avoid an obstacle in the road, or making a left-hand turn, see O.C.G.A. § 40-6-40(a), and state law authorizes a police officer to stop a driver not complying with this mandate, see, e.g., Trudewind v. State, 480 S.E.2d 211, 212 (Ga. Ct. App. 1996).

Gay saw Plaintiff leaning so far forward in his seat as he turned from Albany Avenue onto J Street that it appeared, from the officer's perspective, that he was not wearing a seatbelt. SMF, ¶ 12. Moreover, it is undisputed that after Plaintiff turned from J Street onto Oak Street, he crossed well over the center line into the oncoming lane of traffic, such that his vehicle was straddling the middle of the roadway. See id. at ¶¶ 19-20. According to Plaintiff's own submission, it was not

AO 72A
(Rev. 8/82)

until that time that Gay activated his lights to pull Plaintiff over. See Pl.'s Resp. to SMF, ¶ 15. Because Gay had probable cause to believe that Plaintiff had violated state traffic laws regarding not only seatbelt use but also the need to stay on the right half of the roadway, Gay's decision to initiate a traffic stop in that moment was justified under the circumstances. See Spoerke, 568 F.3d at 1248 (finding that a traffic stop was lawful where the officer "had probable cause, based on [a] littering violation, to stop the vehicle" (citing United States v. Cooper, 133 F.3d 1394, 1398 (11th Cir. 1998))); see also Clark, 700 S.E.2d at 684 (ruling that the officer's unobstructed observation that the defendant did not appear to be wearing a seatbelt, even if erroneous, warranted a traffic stop).

Additionally, or in the alternative, the record supports a finding that there existed at least arguable reasonable suspicion that Plaintiff was engaging in criminal activity or otherwise driving under some impairment of a noncriminal nature. Courts in both this and other circuits have recognized that an unusual driving pattern plus "some other indicia of impairment" may be sufficient to furnish reasonable suspicion. See United States v. Pompa, No. CR408-078, 2008 WL 4360692, at *2 (S.D. Ga. Sept. 24, 2008) (collecting cases). It is also well established that "relevant contextual considerations" may contribute to reasonable suspicion, such as "the relevant characteristics of a

AO 72A
(Rev. 8/82)

location," including whether it is a "high crime area," Illinois v. Wardlow, 528 U.S. 119, 124 (2000) (citing Adams v. Williams, 407 U.S. 143, 144, 147-48 (1972)), and the time of day at which the events take place, see, e.g., Hargis, 586 F. App'x at 499 (finding that reasonable suspicion existed based, in part, on the fact that the driver's unusual behavior occurred "in the early morning hours").

Gay believed, even if mistakenly so, that Plaintiff's vehicle was traveling far to the right side of the road on Albany Avenue, possibly creating a hazard and indicating impairment. SMF, ¶ 7. Plaintiff then turned onto J Street and subsequently onto Oak Street, where he crossed far over the center line into the oncoming lane of traffic. Id. at ¶ 19. When Gay reached Oak Street, he observed Plaintiff pulling his vehicle halfway into the oncoming lane so that it was straddling the center line. Id. at ¶¶ 18-20; Pl.'s Resp. to SMF, ¶ 15. Significantly, these events occurred around midnight in a neighborhood with a history of drug activity. SMF, ¶¶ 3, 28. On these facts, a reasonable officer in Gay's position would have had a particularized and objective basis for believing that Plaintiff may have been operating the vehicle under the influence of drugs or alcohol or some other impairment, and that a stop was warranted on that basis. See Croom v. State, 458 S.E.2d 679, 680-81 (Ga. Ct. App. 1995) (finding that the officer

AO 72A
(Rev. 8/82)

had reasonable suspicion that the driver was under the influence of alcohol, based on his erratic driving, including "continuously weaving . . . all over the road," and odd behavior); cf. Pompa, 2008 WL 4360692, at *2 (stating that there was no reasonable suspicion to support a stop where the driver—though traveling in an unusual pattern late at night—"lack[ed] any further indicia of impairment" such as "weaving within the lane, crossing over the center or shoulder line, making an abrupt stop or wide turn, or some other form of erratic driving").

Plaintiff's arguments urging a contrary result are unavailing. First, Plaintiff emphasizes that he was, in fact, wearing his seatbelt, and that Gay was mistaken in thinking otherwise. Dkt. No. 48, pp. 7-8, 14-15. But, as discussed above, it is undisputed that Plaintiff leaned far forward in his seat while turning onto J Street, and that Gay had not fully caught up to Plaintiff's vehicle by that time. SMF, ¶¶ 8, 12. A reasonable officer viewing these events from Gay's perspective would have had adequate reason to believe that Plaintiff was not wearing a seatbelt, in violation of state law, and that a stop was justified. Because Gay's assessment of and inferences drawn from the circumstances were reasonable, the fact that he ultimately may have been mistaken about the actual state of affairs has no bearing on the constitutionality of his conduct.

AO 72A
(Rev. 8/82)

See United States v. Chanthasouxat, 342 F.3d 1271, 1276 (11th Cir. 2003) ("An officer's mistake of fact may provide the objective basis for reasonable suspicion or probable cause under the Fourth Amendment." (citing Ornelas v. United States, 517 U.S. 690, 695-96 (1996))); see also Anderson v. Creighton, 483 U.S. 635, 641 (1987) ("We have recognized that it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials . . . should not be held personally liable." (citing Malley v. Briggs, 475 U.S. 335, 344-45 (1986))). Second, Plaintiff contends that Gay "manufactured facts to cover for his nefarious actions," dkt. no. 48, pp. 7-8, 15-16; however, given that the Fourth Amendment inquiry is viewed from the standpoint of a reasonable officer, any subjective intentions that Gay may have harbored would not negate the objective reasonableness—and thus the constitutionality—of his actions. See United States v. Benitez, 541 F. App'x 961, 962-63 (11th Cir. 2013) (rejecting the defendant's argument that the officer's reasons for stopping his vehicle were pretextual, and reasoning that "an officer's subjective motivation 'does not invalidate what is otherwise objectively justifiable behavior under the Fourth Amendment.'" (quoting Harris, 526 F.3d at 1337)).

23

b.   Allegations That the Stop Became an
     Unreasonable Seizure

An investigative stop must be "reasonably related in scope
to the circumstances which justified the interference in the
first place." United States v. Acosta, 363 F.3d 1141, 1145
(11th Cir. 2004) (alteration in original) (quoting United States
v. Sharpe, 470 U.S. 675, 682 (1985)).  A stop that is warranted
initially nevertheless may become unlawful if it goes "too far"
and evolves into a full-scale arrest that is not itself
supported by probable cause.  Id.; United States v. Hastamorir,
881 F.2d 1551, 1556 (11th Cir. 1989); see also Terry, 392 U.S.
at 1883 (stating that an officer making an arrest must have
probable cause to believe that the individual has committed a
crime).  The distinction between an investigative detention and
an arrest "is one of extent, with the line of demarcation
resulting from the weighing of a 'limited violation of
individual privacy involved against the opposing interests in
crime prevention and detection and in the police officer's
safety.'"  Acosta, 363 F.3d at 1146 (quoting Dunaway v. New
York, 442 U.S. 200, 209 (1979)).  The Eleventh Circuit has set
forth four factors to assist in determining whether a mere stop
or an arrest has occurred: (1) "the law enforcement purposes
served by the detention"; (2) "the diligence with which the
police pursue the investigation"; (3) "the scope and

24

intrusiveness of the detention"; and (4) "the duration of the detention." Id. (quoting United States v. Gil, 204 F.3d 1347, 1351 (11th Cir. 2000)).

Applying the factors in this case, the Court finds that the encounter between Gay and Plaintiff did not exceed the reasonable bounds of a traffic stop and thus did not mature into a de facto arrest. In analyzing the law enforcement purposes served under the first factor, "the most important consideration 'is whether the police detained the defendant to pursue a method of investigation that was likely to confirm or dispel their suspicions quickly, and with a minimum of interference.'" Id. at 1147 (alterations omitted) (quoting Gil, 204 F.3d at 1351); see also United States v. Hardy, 855 F.2d 753, 759 (11th Cir. 1988) (requiring that the officers utilize "brief, minimally intrusive investigation technique[s]"). As it is undisputed that Gay stopped Plaintiff for a seatbelt violation, checked his license, and issued a citation—and that Gay did not search the vehicle or pursue any other investigation unrelated to the purpose of the traffic stop, SMF, ¶¶ 29, 31–32, 35, 39–40—Gay's course of action was reasonably designed to lead to a quick and noninvasive resolution of the suspected traffic violation. The second factor, which considers whether the officer was diligent in pursuing the investigation, turns on "whether the methods the police used were carried out without unnecessary delay."

AO 72A
(Rev. 8/82)

Acosta, 363 F.3d at 1146 (citing Sharpe, 470 U.S. at 686-87; and Hardy, 855 F.2d at 759-60). Because nothing in the record indicates that Gay delayed at any point in checking Plaintiff's information and issuing a citation, there is no basis upon which to find that Gay was anything other than diligent in carrying out his investigation of the traffic violation.

Under the third factor, a court must evaluate "whether the scope and intrusiveness of the detention exceeded the amount reasonably needed by police to ensure their personal safety." Acosta, 363 F.3d at 1146 (citing Michelle v. Long, 463 U.S. 1032, 1047-48 (1983); and Pennsylvania v. Mimms, 434 U.S. 106, 110-11 (1977)). An officer conducting an investigative stop may take "reasonable steps" to ensure his own safety so long as he possesses "an articulable and objectively reasonable belief that the suspect is potentially dangerous." Id. at 1146-47 (quoting Long, 463 U.S. at 1051). Traffic stops in particular are "especially fraught with danger to police officers" and, therefore, warrant an officer taking "negligibly burdensome precautions" to enable him to safely effectuate the purposes of the stop. Rodriguez v. United States, 135 S. Ct. 1609, 1614, 1616 (2015) (quoting Arizona v. Johnson, 555 U.S. 323, 330 (2009)) (indicating that the "mission" of a traffic stop is not only to "address the traffic violation that warranted the stop"

26

but also to "attend to related safety concerns" (citing Illinois v. Caballes, 543 U.S. 405, 407 (2005))).

An officer may lawfully direct the driver and any passengers of a vehicle to exit the vehicle "as a matter of course." Spoerke, 568 F.3d 1236 (citing Maryland v. Wilson, 519 U.S. 408, 410 (1997); and Mimms, 434 U.S. at 110-12); see also United States v. Roper, 702 F.2d 984, 987 (11th Cir. 1983) ("[A]n investigative stop does not become an arrest merely because an officer directs the subject of an investigation out of a vehicle."). Additionally, the officer's "use of a particular method to restrain a person's freedom of movement does not necessarily make police action tantamount to an arrest." Courson, 939 F.2d at 1492 (quoting United States v. Kapperman, 764 F.2d 786, 790 n.4 (11th Cir. 1985)). As the Eleventh Circuit stated in Acosta,

> an investigatory stop does not necessarily ripen into an arrest because an officer draws his weapon, United States v. Roper, 702 F.2d 984, 987-88 (11th Cir. 1983), handcuffs a suspect, United States v. Hastamorir, 881 F.2d 1551, 1557 (11th Cir.1989), orders a suspect to lie face down on the ground, Courson v. McMillian, 939 F.2d 1479, 1492-93 (11th Cir. 1991), or secures a suspect in the back of a patrol car, Gil, 204 F.3d at 1351.

363 F.3d at 1147. That safety may have been accomplished by "less intrusive" means does not render the search unreasonable, unless the officer acted unreasonably in failing to recognize

AO 72A
(Rev. 8/82)

and pursue the alternative means. Courson, 939 F.2d at 1491 (quoting Sharpe, 470 U.S. at 686-87).

Here, the scope and intrusiveness of the traffic stop were reasonable under the circumstances. Although Gay used rather intrusive measures to carry out the objectives of the stop— including drawing his weapon, ordering Plaintiff out of the vehicle, and making him lie on the ground to be handcuffed, SMF, ¶¶ 29, 31-32—the prevailing case law makes clear that those measures did not automatically transform the traffic stop into an arrest. Moreover, the evidence demonstrates that this level of restraint was necessary to ensure Gay's safety, in light of the following circumstances: (1) Plaintiff was driving in an area known for drugs and other criminal activity; (2) the encounter occurred around midnight; (3) Gay saw Plaintiff make an unusual maneuver by turning his vehicle into the oncoming lane of traffic and stopping with his vehicle straddling both lanes; (4) Gay saw Plaintiff's vehicle roll backward toward his police car; and (5) Gay was alone. Id. at ¶¶ 3, 19-20, 24, 28; see also Mimms, 434 U.S. at 110-11 (finding that concern for the officer's safety justified ordering a driver to get out of his vehicle, despite the officer having no reason to believe that the driver was armed or dangerous and had stopped him for a minor traffic violation); Courson, 939 F.2d at 1493 (ruling that it was reasonable for an officer in an investigatory stop, out

AO 72A
(Rev. 8/82)

of concern for his own safety, to draw his gun and order the occupants of a vehicle to exit and lie on the ground, given that it was late at night and the officer was alone); Roper, 702 F.2d at 987 (discussing with approval a Fifth Circuit decision finding that an officer exhibited "proper caution" in drawing his gun and pointing it at the vehicle in a traffic stop, based on the fact that he "was alone and approaching a car containing three young males" (citing United States v. Maslanka, 501 F.2d 208, 213 n.10 (5th Cir. 1974))).

As to the fourth and final factor, which looks at the duration of the detention, the Eleventh Circuit has determined that "[t]here is no rigid time limitation or bright line rule" as to what constitutes an acceptable length of time for an investigative stop. Acosta, 363 F.3d at 1147 (citing United States v. Place, 462 U.S. 696, 709-10 (1983)). Rather, the test under this factor is one of "common sense and ordinary human experience." Id. (quoting Sharpe, 470 U.S. at 685). In the case of a routine traffic stop, the detention need not go beyond the time that it takes for the officer to request a driver's license and vehicle registration, check this information on the computer, issue a traffic citation, United States v. Pruitt, 174 F.3d 1215, 1219 (11th Cir. 1999) (citing United States v. Gonzalez-Lerma, 14 F.3d 1479, 1983 (10th Cir. 1994)), and attend to any related safety concerns, Rodriguez, 135 S. Ct. at 1614.

AO 72A
(Rev. 8/82)

This factor lends further support to the conclusion that the encounter in this case was merely an investigative stop. The record facts reflect that Gay stopped Plaintiff and immediately approached the vehicle, ordered Plaintiff to get out and lie on the ground, and handcuffed him. SMF, ¶¶ 18, 22, 29, 31-32. Plaintiff was on the ground for only twenty-five seconds before Gay stood him up, checked his license, and removed the handcuffs. Id. at ¶¶ 33-35. As discussed above, Gay never searched Plaintiff's vehicle or pursued any unrelated line of questioning. Id. at ¶ 39. Rather, Gay promptly issued a traffic citation to Plaintiff, and Plaintiff was free to go at that time. See id. at ¶ 40. While the record is unclear as to the exact length of time between Gay stopping Plaintiff and issuing the citation, the evidence that Gay pursued this limited and appropriate investigation without delay is such that no reasonable juror could find that the duration of the stop was unreasonable in relation to its purpose. See Acosta, 363 F.3d at 1148 (thirty-minute detention was not an unreasonable duration for a stop); Gil, 204 F.3d at 1350 (detention for seventy-five minutes in handcuffs in the back of a patrol car was insufficient to convert a lawful stop into an arrest); cf. Place, 462 U.S. at 709-10 (ninety-minute detention was too long for an investigative stop).

30

Thus, each of the above factors weighs heavily in favor of finding that the scope of Plaintiff's detention was reasonably related to the purposes of the traffic stop. As the record lacks any evidence that the stop went "too far" and developed into a full-scale arrest without probable cause, no reasonable juror could find a constitutional violation on these grounds.

### c. Allegations of Excessive Force

Whether an officer's use of force in an investigatory stop rendered the seizure unreasonable for purposes of the Fourth Amendment is determined by an "objective reasonableness" standard. Hadley v. Gutierrez, 526 F.3d 1324, 1329 (11th Cir. 2008) (citing Brosseau v. Haugen, 543 U.S. 194, 197 (2004)). Under this standard, "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Graham v. Connor, 490 U.S. 386, 397 (1989) (citing Scott v. United States, 436 U.S. 128, 137-39 (1978)). This determination requires that a court "carefully balance 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against 'the countervailing governmental interests at stake' under the facts of the particular case." Oliver v. Fiorino, 586 F.3d 898, 905 (11th Cir. 2009) (quoting Graham, 490 U.S. at 396).

AO 72A
(Rev. 8/82)

Specifically, a court must "measure[s] the quantum of force employed" against the following factors: (1) "the severity of the crime at issue"; (2) "whether the suspect poses an immediate threat to the safety of the officers or others"; and (3) "whether the suspect actively resisted arrest or attempted to evade arrest by flight." Id. (citing Lee v. Ferraro, 284 F.3d 1188, 1197-98 (11th Cir. 2002)). This inquiry is to be made "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396 (citing Terry, 392 U.S. at 20-22). This is because "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Id. at 396-97.

In the instant case, the record establishes, as a matter of law, that Gay's use of force was objectively unreasonable under the circumstances. While Plaintiff's briefing does not specifically discuss the relative quantum of force employed by Gay, see dkt. no. 48, pp. 11-14, it is common knowledge that the use of a gun can cause death or serious physical injury. Even so, it is undisputed that Gay merely drew his weapon in this case and did not fire it at any time. See SMF, ¶ 29. Gay also shouted at Plaintiff to get out of the car and to lie on the

AO 72A
(Rev. 8/82)

ground, but the record reflects that he did not use physical force to make Plaintiff comply with these commands, see id. at ¶¶ 29, 31, and that Plaintiff did not sustain any physical injury as a result of the encounter, id. at ¶ 51.

Gay puts forth evidence showing that this level of force was justified under the circumstances. As Gay acknowledges, Plaintiff was stopped for a relatively minor, nonsevere traffic violation. See SMF, ¶¶ 12, 19; see also Oliver, 586 F.3d at 905 (citing Lee, 284 F.3d at 1197-98) (measuring "the quantum of force employed" against "the severity of the crime at issue"). Nevertheless, Gay demonstrates that when he stopped Plaintiff's vehicle, he had an objectively reasonable belief that Plaintiff posed an immediate threat to his safety. See Oliver, 586 F.3d at 905 (citing Lee, 284 F.3d at 1197-98) (considering "whether the suspect poses an immediate threat to the safety of the officers or others"). As discussed above, traffic stops are "especially fraught with danger to police officers," Rodriguez, 135 S. Ct. at 1616 (quoting Johnson, 555 U.S. at 330), and, therefore, an officer conducting a stop may lawfully take "reasonable steps" to ensure his own safety where he reasonably believes that the individual poses a threat, Acosta, 363 F.3d at 1146-47 (quoting Long, 463 U.S. at 1051).

Here, Gay was alone, around midnight, conducting a traffic stop in an area known for drugs. SMF, ¶¶ 3, 28. Instead of

33

pulling over to the side of the road, as is common in a traffic stop, Plaintiff angled his vehicle such that the driver's side door was facing toward Gay, id. at ¶¶ 26-27, with the window open, Gay dep., 36:12-13. Once Gay stepped out of his car, Plaintiff's vehicle rolled backward toward him. SMF, ¶¶ 22, 24. In this tense moment, a police officer in Gay's position could have reasonably concluded that Plaintiff was positioning to shoot at him out of the driver's side window, and would not have needed to wait and see whether Plaintiff was, in fact, going to do so. See Oakes v. Anderson, 494 F. App'x 35, 40 (11th Cir. 2012) ("[The officer] need not have taken that chance and hoped for the best." (internal quotation marks omitted) (quoting Scott v. Harris, 550 U.S. 372, 385 (2007))). Rather, a reasonable officer under these circumstances would have been justified in taking reasonable action to protect his own safety, including drawing his weapon, ordering Plaintiff to get out of the vehicle and onto the ground, and handcuffing him. See Acosta, 363 F.3d at 1147 (collecting cases); see also Courson, 939 F.2d at 1496 (finding that an officer did not use excessive force in drawing his gun and directing the occupants of a vehicle to get out and get on the ground, based, in part, on the fact that the officer was "alone late at night" when he stopped the vehicle and "could not have known if the[] [vehicle's occupants] were armed"). That Gay was mistaken in his assessment of the actual threat

34

posed by Plaintiff does not change this result, as the reasonableness of his belief at that time is the touchstone of this analysis. See Carr v. Tatangelo, 338 F.3d 1259, 1269 & n.19 (11th Cir. 2003) (finding no constitutional violation where the police officer shot a suspect under the reasonable but mistaken belief that there was probable cause to find that a suspect presented an immediate threat of serious physical harm).[8]

Finally, the evidence shows that Gay had an objectively reasonable basis for believing that Plaintiff was attempting to flee. See Oliver, 586 F.3d at 905 (citing Lee, 284 F.3d at 1197-98) (balancing the quantum of force against "whether the suspect actively resisted arrest or attempted to evade arrest by flight"). When Gay turned onto Oak Street and activated his lights, Plaintiff was pulling his vehicle into the oncoming lane. See SMF, ¶¶ 16, 18-20. Plaintiff then stopped his vehicle in the middle of the street, Pl.'s dep., 49:19-20, 51:1-3, and turned the steering wheel sharply to the left and then to the right, SMF, ¶ 21. At that time, Gay exited his police car, thinking that Plaintiff was going to jump out of his vehicle and

---

[8] Nor does the fact that Gay's use of force was found to have violated police department policy have any bearing on the outcome here. See Philpot v. Warren, No. CIV.A.1:02-CV2511JOF, 2006 WL 463169, at *7 (N.D. Ga. Feb. 24, 2006) (stating that the county police department's decision to terminate the officer for the conduct at issue did not preclude a determination that the officer was entitled to qualified immunity, because the inquiry into whether an officer violated department policy and is subject to punishment is not coextensive with the question of whether he violated clearly established constitutional rights and thus is stripped of qualified immunity).

AO 72A
(Rev. 8/82)

attempt to run away on foot, only to see Plaintiff's vehicle roll back suddenly before coming to another stop. SMF, ¶¶ 22, 24. A reasonable officer, not knowing what Plaintiff was doing, could have believed that Plaintiff's abrupt maneuvers signaled an intent to flee by car or perhaps on foot.[9]

Thus, on balance, the significant intrusion on Plaintiff's Fourth Amendment rights was outweighed by the concern for Gay's safety and the apparent threat that he could have caused severe physical harm to the officer. In such circumstances, Gay's decision to draw his weapon, direct Plaintiff to exit the vehicle and lie on the ground, and handcuff him was objectively reasonable and, therefore, did not violate his constitutional rights in any way. Because Plaintiff must show both a violation of a federal right and that such right was clearly established in order to hold Gay liable for his discretionary acts under Section 1983, Plaintiff's Section 1983 claims must fail on this basis. Nevertheless, the Court, in an abundance of caution, proceeds to consider whether the rights allegedly violated were clearly established.

---

[9] To the extent that Plaintiff relies on the same grounds used to dispute the unreasonable seizure allegations—namely, that he was engaged in entirely lawful conduct and that Gay allegedly fabricated reasons to stop him, see dkt. no. 48, pp. 14–16—these arguments fail for the same reasons discussed previously, in that they do not undermine the objective reasonableness of Gay's actions.

AO 72A
(Rev. 8/82)

## 3. Clearly Established Law

For the law to be "clearly established" such that a plaintiff can overcome the qualified immunity defense, "the law must have earlier been developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law." Jenkins by Hall v. Talladega City Bd. of Educ., 115 F.3d 821, 823 (11th Cir. 1997) (internal quotation marks omitted) (quoting Lassiter v. Ala. A & M Univ., Bd. of Trustees, 28 F.3d 1146, 1149 (11th Cir. 1994)); see also Post v. City of Fort Lauderdale, 7 F.3d 1552, 1557 (11th Cir. 1993) ("[The] 'clearly established' standard demands that a bright line be crossed."). Where the existing case law "has not staked out a bright line" showing that a particular course of police conduct is clearly unconstitutional, "qualified immunity almost always protects the defendant," Post, 7 F.3d at 1557 (citing Dartland v. Metro. Dade Cty., 866 F.2d 1321, 1323 (11th Cir. 1989)), unless the plaintiff can show that the defendant's actions were "so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the official" even without case law on point, Smith v. Mattox, 127 F.3d 1416, 1419 (11th Cir. 1997).

Plaintiff's Response to the instant Motion does not cite any legal precedent that would have put Gay on notice that his

AO 72A
(Rev. 8/82)

actions in stopping Plaintiff for potential seatbelt and lane violations were unlawful.  See Dkt. No. 48, pp. 8-11.  Rather, as discussed above, it is Gay who identifies case law confirming that probable cause or reasonable suspicion exists in those circumstances, and Plaintiff fails to distinguish those cases or otherwise convince the Court that the rulings are inapplicable. Plaintiff also fails to cite any well-established law demonstrating that Gay violated Plaintiff's constitutional rights in drawing a weapon, ordering him to exit the vehicle and lie on the ground, and handcuffing him.  See id. at pp. 11-14. Nor can he, as the prevailing case law, set forth herein, makes clear that an officer may take these exact measures when he reasonably believes that the individual poses a safety threat. Plaintiff's Section 1983 claims thus fail for this additional reason.

In sum, Plaintiff does not put forth any evidence that Gay violated his federal rights, much less that those rights were clearly established, so as to overcome the application of qualified immunity in this case.  Because qualified immunity completely shields Gay from liability for his discretionary actions in these circumstances, no reasonable jury could find for Plaintiff on his Section 1983 claims.  Gay is thus entitled to judgment in his favor on these claims, and this portion of his Motion is **GRANTED**.

AO 72A
(Rev. 8/82)

## C. State-Law Claims Against Gay in His Individual Capacity (Counts One, Two, and Four)

The Georgia Constitution enshrines the principal of official immunity, stating that a public official must not be subject to suit for the performance of a discretionary function unless he "act[s] with actual malice or with actual intent to cause injury." Gilbert v. Richardson, 452 S.E.2d 476, 482-83 (Ga. 1994) (quoting Ga. Const. art. I, § 2, para. 9(d)). Under Georgia law, a discretionary act is one "call[ing] for the exercise of personal deliberation and judgment, which in turn entails examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed." Schulze v. DeKalb Cty., 496 S.E.2d 273, 276 (Ga. Ct. App. 1998) (quoting Johnson v. Gonzalez, 478 S.E.2d 410, 410 (Ga. Ct. App. 1996)). "Actual malice" denotes "express malice or malice in fact," which require "a deliberate intention to do wrong." Merrow v. Hawkins, 467 S.E.2d 336, 337-38 (Ga. 1996) (quoting Black's Law Dictionary (6th ed. 1990)). In this way, actual malice is distinct from "malice," which Georgia courts have defined as exhibiting "reckless disregard for the rights of others," as well as the concept of "implied malice" embracing conduct that demonstrates a "reckless disregard for human life." Id. at 338. Nor does mere ill will or "rancorous personal feelings" toward a plaintiff rise to the level of actual malice when paired with a

AO 72A
(Rev. 8/82)

lawful act. Phillips v. Hanse, 637 S.E.2d 11, 13 (Ga. 2006)

(citing Merrow, 467 S.E.2d at 337). "Actual intent to cause

injury," by contrast, requires intent to cause the harm suffered

by the plaintiff and "not merely an intent to do the act

purportedly resulting in the claimed injury." Selvy v.

Morrison, 665 S.E.2d 401, 405 (Ga. Ct. App. 2008) (quoting Kidd

v. Coates, 518 S.E.2d 124, 124 (Ga. 1999)).

Gay succeeds in establishing, as a matter of law, that he

enjoys immunity against Plaintiff's claims of false arrest,

intentional infliction of emotional distress, and assault and

battery under Georgia law. As a threshold matter, Gay was

performing discretionary acts when he stopped Plaintiff for a

traffic violation and took steps to protect his safety during

the stop, as he relied on his experience and training to

evaluate the circumstances, make reasoned conclusions, and

decide the appropriate course of action. See City of

Indianapolis v. Edmond, 531 U.S. 32, 51 (2000) (stating that the

officer's decision to initiate a traffic stop was

discretionary); Tittle v. Corso, 569 S.E.2d 873, 876 (Ga. Ct.

App. 2002) (ruling that the officer performed discretionary acts

in conducting an investigative stop, ordering the driver of the

vehicle to lie face down on the ground, and holding a gun to his

head).

Plaintiff, however, cites no evidence that Gay possessed a wicked or evil motive in performing these acts. The record, in fact, proves quite the opposite, as it reveals that Gay did not know Plaintiff or have any encounters with him or his family prior to the incident in question. SMF, ¶¶ 66-67. The evidence also shows that Gay kept Plaintiff handcuffed on the ground for only twenty-five seconds before helping him return to a standing position. Id. at ¶¶ 33-34. Furthermore, Gay removed the handcuffs promptly upon learning that Plaintiff lived at the adjacent house and verifying his address on his driver's license. Id. at ¶¶ 33, 35. While Gay shouted at Plaintiff in certain instances, there is no evidence that Gay threatened Plaintiff or physically treated him in a rough manner at any time. Id. at ¶¶ 30, 51. On these facts, no reasonable factfinder could conclude that Gay targeted, threatened, or otherwise treated Plaintiff in such a way that would indicate that he intended to violate Plaintiff's rights.

Plaintiff's argument that Gay exhibited malice in fabricating a story about him not wearing a seatbelt and having a broken taillight or brake light, dkt. no. 48, p. 17, is unavailing. Plaintiff cites case law for the proposition that, for the purposes of a false arrest claim, a plaintiff may prove actual malice "by presenting evidence of personal animus toward the arrestee, manufactured evidence, or knowing presentation of

AO 72A
(Rev. 8/82)

perjured testimony." Id. (citing Marshall v. Browning, 712
S.E.2d 71, 74 (Ga. Ct. App. 2011)). For the reasons previously
stated, there is no factual basis for finding that Gay had any
personal animus toward Plaintiff. Nor does Plaintiff put forth
any evidence, beyond his conclusory allegations, that Gay
manufactured evidence or gave false testimony concerning his
beliefs that Plaintiff was not wearing a seatbelt and that his
taillight or brake light was not working. As discussed above,
Gay's conclusions based on his observations—even if mistaken—
were reasonable under the circumstances, and nothing about his
conduct at that time or during the stop suggested any malice on
his part.

Because Plaintiff cannot establish this requirement to
abrogate official immunity, Plaintiff cannot succeed on his
state-law claims against Gay in his individual capacity. Gay's
Motion is thus **GRANTED** as to these claims.[10]

## II. The City's Motion for Summary Judgment (Dkt. No. 39)

The City moves for judgment in its favor on all of
Plaintiff's claims against it. Dkt. No. 39-2. The City
initially argues that, to the extent that Plaintiff intends to
assert a cause of action against it under Section 1983,
Plaintiff fails to put forth any evidence of a widespread policy

---

[10] Based on the Court's finding that Plaintiff cannot sustain any
claim against Gay under federal or state law, the Court need not
address the issue of punitive damages.

or custom for which the City could be liable.  _Id._ at pp. 12-15.
The City also contends that it enjoys sovereign immunity against
Plaintiff's state-law claims.  _Id._ at pp. 15-17.  Notably,
Plaintiff has not filed a response in opposition to the City's
Motion.

As discussed previously, a plaintiff's failure to respond
to a motion for summary judgment on a claim set forth in the
complaint constitutes an abandonment of that claim.  See Clark,
544 F. App'x at 855.  In this case, Plaintiff responded to Gay's
Motion but never submitted any response, or otherwise raised any
opposition, to the Motion filed by the City.  As the window in
which to file a response has long passed, and Plaintiff has not
requested leave to file an untimely response at any point during
the nearly ten-month period since that time, Plaintiff is deemed
to have abandoned his claims against the City.  The entry of
judgment in favor of the City is, therefore, appropriate.  The
City's Motion is **GRANTED**.

Even so, the Court notes that even if Plaintiff did intend
to proceed with his claims against the City, those claims would
be due to be dismissed at this stage.  Given the Court's
determination that Gay did not violate Plaintiff's rights in any
way, there is no misconduct by Gay for which the City could be
held liable on a theory of respondeat superior.  Nor is there
any evidence that would support a finding in Plaintiff's favor

AO 72A
(Rev. 8/82)

on his negligent supervision claim against the City directly. See <u>Lowe v. Jones Cty.</u>, 499 S.E.2d 348, 350 (Ga. Ct. App. 1998) (explaining that "[t]he operation of a police department, including the degree of training and supervision to be provided its officers, is a discretionary governmental function," and, as such, a city may be liable based on the exercise of this function "only when the acts complained of are done within the scope of the officer's authority and with wilfulness, malice or corruption" (quoting <u>McDay v. City of Atlanta</u>, 420 S.E.2d 75, 75 (Ga. Ct. App. 1992))). Thus, even if Plaintiff had raised opposition to the City's Motion, any attempt to defeat summary judgment on these facts would be futile.

### CONCLUSION

In light of the foregoing, Defendants' Motions for Summary Judgment (dkt. nos. 37, 39) are hereby **GRANTED**. The Clerk of Court is **DIRECTED** to enter the appropriate judgment and to close this case.

**SO ORDERED**, this 9TH day of August, 2016.

_____
LISA GODBEY WOOD, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

AO 72A
(Rev. 8/82)